## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 12 2017, 1:47 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

D.S., Pro Se
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.S, <br> *Appellant-Respondent*, <br><br> v. <br><br> A.R., <br> *Appellee-Petitioner*. | May 12, 2017 <br><br> Court of Appeals Case No. <br> 29A05-1608-PO-1893 <br><br> Appeal from the Hamilton Superior Court <br><br> The Honorable Gail Z. Bardach, Judge <br><br> Trial Court Cause No. <br> 29D06-1606-PO-5638 |

**Brown, Judge.**

[1] D.S., *pro se*, appeals the trial court's protective order. D.S. raises two issues which we consolidate and restate as whether there was sufficient evidence to issue the order. We affirm.

## Procedural History

[2] On June 29, 2016, A.R. filed a petition for an order for protection against D.S. alleging she is a victim of domestic or family violence, she and D.S. had dated each other, and D.S. attempted to and did cause physical harm to her, placed her in fear of physical harm, and committed stalking against her. On June 30, 2016, the court issued an *ex parte* order for protection finding that A.R. had shown by a preponderance of the evidence that domestic or family violence or stalking had occurred sufficient to justify the issuance of the order and that D.S. represented a credible threat to the safety of A.R. or a member of her household.

[3] On August 4, 2016, the court held a hearing at D.S.'s request at which A.R., one of her daughters, and D.S. testified. The court found that D.S.'s conduct constituted stalking and entered a permanent order for protection which would remain in effect through June 30, 2018.

## Discussion

[4] The issue is whether there was sufficient evidence to issue the protective order. We apply a two-tiered standard of review: first we determine whether the evidence supports the findings and then whether the findings support the order. *Fox v. Bonam*, 45 N.E.3d 794, 798 (Ind. Ct. App. 2015); *Mysliwy v. Mysliwy*, 953

N.E.2d 1072, 1075-1076 (Ind. Ct. App. 2011), *trans. denied*. In deference to the trial court's proximity to the issues, we disturb the order only where there is no evidence supporting the findings or the findings fail to support the order. *Fox*, 45 N.E.3d at 798; *Mysliwy*, 953 N.E.2d at 1076. We do not reweigh evidence or reassess witness credibility. *Fox*, 45 N.E.3d at 798. We consider only the probative evidence and reasonable inferences supporting the order. *Tisdial v. Young*, 925 N.E.2d 783, 785 (Ind. Ct. App. 2010).

[5] D.S. is proceeding *pro se* and as such is held to the same standard as trained counsel and is required to follow procedural rules. *See Evans v. State*, 809 N.E.2d 338, 344 (Ind. Ct. App. 2004), *trans. denied*. The court will not indulge in any benevolent presumptions on his behalf. *See Ballaban v. Bloomington Jewish Cmty., Inc.*, 982 N.E.2d 329, 334 (Ind. Ct. App. 2013). A.R. has not filed an appellee's brief. When an appellee has not filed brief, we need not undertake the burden of developing an argument on the appellee's behalf. *Henderson v. Henderson*, 919 N.E.2d 1207, 1210 (Ind. Ct. App. 2010). Rather, we may reverse the trial court if the appellant presents a case of *prima facie* error. *Id*.

[6] D.S. requests that we reverse the trial court's protective order and argues that no copies of the alleged e-mail or text messages containing vulgar and abusive language were entered into evidence, the only specific incident A.R. was able to cite as threatening was his threat to commit suicide, and A.R. provided no proof of physical violence or a threat of violence to warrant a protective order. He asserts that A.R. could have presented the court with phone records, copies

of e-mails, screen shots of text messages, and the alleged police report she claimed to have filed, but that she provided the court with nothing.

[7] D.S. further asserts the court erred in ruling he engaged in stalking on June 10, 2016, arguing that A.R. had let him in her home and did not tell him to leave; he left A.R.'s home when she stated she did not want to continue seeing him; he "returned to her home an hour later and left gifts on her porch that she had given him (a blanket and photo album, nothing threatening)"; he "only knocked once on [A.R.'s] window"; the only contact made was a knock on her window to let her know that items had been left on her porch; he never threatened, became angry, or made any contact with A.R. except to knock on her window; and there was no evidence that suggested he made ongoing, unwanted contact leading up to or after the June 10, 2016 event. Appellant's Brief at 15. He notes A.R. sought the protective order on June 29, 2016, and argues "[i]f [A.R.] was in such fear, why would she wait nearly 20 days to file for a protective order?" *Id.* He also argues: "Would a reasonable person have felt terrorized by a blanket and photo album being left on their porch? It was simply a statement that the relationship had been a fraud and that he was hurt." *Id.* at 18.

[8] The Indiana Civil Protection Order Act was designed to promote protection and safety for all victims of domestic or family violence in a fair, prompt, and effective manner and to prevent future domestic and family violence. Ind. Code § 34-26-5-1. "Domestic or family violence" includes stalking, "whether or

not the stalking . . . is committed by a family or household member." Ind. Code § 34-6-2-34.5. "Stalking" means:

> a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened. The term does not include statutorily or constitutionally protected activity.

Ind. Code § 35-45-10-1. "Harassment" means "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2. "'Impermissible contact' includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code § 35-45-10-3. When a petitioner proves by a preponderance of the evidence that the respondent "represents a credible threat to the safety of a petitioner or a member of a petitioner's household," the trial court "shall grant relief necessary to bring about a cessation of the violence or the threat of violence." Ind. Code § 34-26-5-9.

[9] At the August 4, 2016 hearing, A.R. testified that she and D.S. had dated each other and was asked to describe the four incidents she detailed in her request for the order for protection. With respect to the first incident on or about April 1, 2004, A.R. testified that she and D.S. had recently rented a house and moved in together; there was lots of depression and alcohol abuse for D.S.; there had

been several incidences of verbal abuse and screaming; and one night it escalated and D.S. pulled her out of bed, yelled and screamed at her, ripped a button off her shirt, stated she did not understand his depression and all the loss he had had, and threatened he was just going to leave and she was going to be stuck with paying the rent. When asked if D.S. threatened her with violence, she answered "[j]ust physical intimidation." Transcript at 7. With respect to the second incident on or about January 1, 2008, A.R. testified she and D.S. had plans to visit a friend's house, he came to pick her up and did not like her attitude, according to him she ruined the evening, she agreed to take him home, he was yelling at her during the whole ride, and she had enough and slapped him.

[10] With respect to the third incident on or about December 1, 2014, A.R. testified that her daughter had been admitted to the hospital on D.S.'s birthday and that this created a huge falling out between them. She testified that, on Christmas Eve, D.S. threatened suicide and told her he had taken a bunch of medicine, she called the police, and he was admitted for an overnight stay. She stated that "after that incident followed hundreds of text messages and e-mails that were very threatening, threatening to my person, threatening to my family." *Id.* at 8. When asked what kinds of things D.S. threatened her with, A.R. replied "I wish I had the hundreds of e-mails that he sent telling me that he was going to commit suicide." *Id.* When asked about his threats to her and her family, she replied: "To me he was verbally abusive. The language, the vulgarity. He never said he would do anything like come and kill me. He never said that he

was going to come and beat me up. . . . But his abuse, his words were very hard to hear." *Id.* at 8-9. She testified that she asked him to remove his things from her home, there was a lot of manipulation about when he could and could not come, she tried very hard to arrange a process so he could obtain his things when she would not be there and they would not have to encounter each other, and that she called the police "to escort him, made all those arrangements if we needed to." *Id.* at 9.

[11] With respect to the fourth incident on or about June 10, 2016, A.R. testified that D.S. arrived at her house wearing only running shorts and tennis shoes and, in her opinion, he had been drinking. She testified that he wanted to know if they could talk, she let him into the entryway, he asked her "if this is what [she] wanted," and she told him that they "were done and [she] did not want to continue to see him anymore." *Id.* at 10. She stated that D.S. said he did not understand, that she replied that it was not for him to understand but to accept, and he left and pulled out of her driveway. She stated that her daughter then arrived home and that D.S. "came back" and "threw some things at [her] door, things that [she] had given him." *Id.* She testified that "[a] few minutes later he came back, pounded on [her] bedroom door, then came around to [her] front door, [and] threw more things at [her] door." *Id.* She said that her "daughter was terrified" and "said we need to call the police, so I did." *Id.* A.R. testified that D.S. "returned a third time throwing more things at [her] door," the police arrived and she filed a report, the police asked her if she wanted them to contact D.S., and she replied that she "didn't want them to at that point because [she]

thought it would just incite him" and that she would file a protection order. *Id.* A.R. indicated that she left home for a vacation two days later and that, when she returned home, she discovered all of her flower pots had been turned over, and that she felt very threatened and feels unsafe in her home, that her children are afraid, and that her children are leaving for college and afraid for her to be home. She also testified "I know that if I don't do something that this will continue." *Id.* at 11.

[12] On cross-examination, D.S.'s counsel referred to the lack of testimony as to any incident where D.S. physically harmed her, and A.R. replied that "[w]hen he pulled me out of bed, if someone puts their hands on you that is physical." *Id.* at 12. A.R. testified D.S. had not threatened her by saying that he would harm her, and that, after he threatened suicide in December 2014, they broke up for a year. She indicated that he contacted her again at the beginning of 2016, she agreed to see him, they went on some dates, and they dated from January until the end of March during which time they went to a couple of movies, spoke on the phone, and sent each other text messages. A.R. indicated that, around March 30, 2016, she blocked D.S. from calling her cell phone in part due to his accusations including claims about her sexuality, and that she had not been contacted by him or seen him since that time until June 10th. She indicated that, when D.S. came back on June 10th and threw some things at her door, he pounded on her window. A.R. also indicated that the items D.S. left on June 10th were gifts she had given him over the years and that she did not see him do anything to the flower pots.

[13]     One of A.R.'s daughters testified that she told A.R. "to call the cops because [she] was scared because when he threw something at the door [she] screamed and it scared him off." *Id.* at 28. A.R.'s daughter further testified that D.S. sent her text messages that night and the next day apologizing for what he said and that she sent him a text telling him not to contact her anymore and that she was going to block his number. She also testified that, on the night D.S. grabbed A.R.'s shirt, she remembers that A.R. placed her daughters in the guest bedroom and D.S. tried to break the door down. The court admitted text messages between D.S. and A.R.'s daughter.

[14]     D.S. testified that he is a psychotherapist, has a masters in mental health counseling, currently works as a counselor, has always suffered from depression, and has been suicidal several times over the years. He testified that he was never physically threatening to A.R. or her children and that he never threatened them with physical harm in any of the e-mail messages in 2014. He indicated his relationship with A.R. was "on-again, off-again" and there was a certain amount of drama. *Id.* at 21. When asked about obtaining his things from A.R.'s house, he replied that he was actually the one who called the police to see if they would escort him because A.R. had threatened his license, stating that she was going to contact the Indiana Professional Licensing Agency and have his license revoked, and that he was afraid of her and was not going to her house unless he could be escorted. He indicated that A.R. blocked him from calling her because he made a comment about an insurance claim and that she blocked him basically to end the relationship. He testified that when he left

A.R.'s house on June 10th, he went home and grabbed a blanket she had given him for Christmas and went back and threw it on her porch, that he went back home and was still upset and brought a photo album she had made for him of his dogs who were deceased and threw it on her porch, and that he did not return a third time as she alleged. He stated that he pounded on the window when he brought the photo album, and when asked why, he replied "[i]t was a statement saying that all of it had been a fraud, that the relationship had been a fraud" and that he knocked on the window to let her know the things were out there because she did not have a doorbell. *Id.* at 24. He indicated he had no contact with A.R. after the night of June 10th.

[15] At the close of the parties' evidence and argument, the court stated: "Stalking is defined in relation to the protective order statute as a course of conduct of harassment that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened. It actually does cause the Victim to feel terrorized, frightened, intimidated, or threatened." *Id.* at 33. It stated "I find, contrary to [D.S.'s] argument, that stalking did exist" and "[a]ny time that someone sends hundreds of e-mails or text messages to another person when the other person doesn't want them, that is a course of conduct of harassment." *Id.* at 33. The court stated that, while the 2004 and 2008 incidents were remote, they provide backdrop for more recent behavior or events and for what occurred in 2014 and 2016. It further stated that A.R.'s testimony was that in 2004 D.S. physically harmed her when he pulled her out of bed and that the e-mail and text messages were extremely upsetting and at times caused her to be unable to work. The

court found "[t]hat certainly goes to what causes a reasonable person to feel terrorized, frightened, intimidated, or threatened and actually does cause the victim to feel that way," that "[i]t's clear from the testimony of her daughter that [D.S.] did engage in stalking, more than one behavior," and "I will leave the Order for Protection in effect as it was originally issued because I do believe that it is legally justified in terms of [D.S.'s] stalking behavior." *Id.* at 33-34.

[16] Based upon the record, we conclude that A.R. presented evidence of probative value to establish by a preponderance of the evidence that D.S.'s actions would cause a reasonable person to suffer emotional distress and feel "terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. Further, the trial court could reasonably infer from the testimony that A.R. and her daughters actually did suffer emotional distress and felt "terrorized, frightened, intimidated, or threatened." *Id.* The evidence supports the trial court's order. We may not reweigh the evidence or reassess the credibility of A.R., D.S., or A.R.'s daughter. D.S. has not presented a case of *prima facie* error.

## *Conclusion*

[17] For the foregoing reasons, we affirm the trial court's order of protection in favor of A.R..

[18] Affirmed.

Vaidik, C.J., and Bradford, J., concur.